IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JERRY CARROLL,

      Plaintiff,

v.                                   No. 05-1174 B

KOHLER COMPANY,

      Defendant.

_____

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS IN THE COMPLAINT
AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTS
I AND II OF THE COUNTERCLAIM
_____

INTRODUCTION

This lawsuit has been brought by the Plaintiff, Jerry Carroll, against the Defendant, Kohler

Company ("Kohler"), alleging wrongful termination in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e, et seq.; the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401,

et seq. (the "THRA"); and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 (the

"TPPA"); and common law retaliatory discharge.  The Plaintiff also brought claims of outrageous

conduct and intentional infliction of emotional distress under state law.  In a counterclaim filed

August 10, 2005, the Defendant asserted against the Plaintiff claims of intentional breach of the duty

of loyalty and duty to report, negligent breach of duty of loyalty and duty to report and civil

conspiracy.[1]  On October 5, 2005, this Court granted the Defendant's motion to dismiss the

_____

[1]The Defendant does not in the instant motion seek dismissal of the civil conspiracy
claim.

outrageous conduct/intentional infliction of emotional distress claim.[2]  In separate motions filed

January 22, 2007, the Defendant moves for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure as to all claims asserted by the Plaintiff and as to its counterclaims alleging

breach of the duty of loyalty.

<u>STANDARD OF REVIEW</u>

Rule 56 states in pertinent part that a

. . . judgment . . . shall be rendered forthwith if the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56©; <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.

Ed. 2d 265 (1986); <u>Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.</u>, 862 F.2d 597, 601 (6th Cir.

1988).

In reviewing a motion for summary judgment, the evidence must be viewed in the light most

favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S.

574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  When the motion is supported by

documentary proof such as depositions and affidavits, the nonmoving party may not rest on his

pleadings but, rather, must present some "specific facts showing that there is a genuine issue for

trial." <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.  It is not sufficient "simply [to] show that there

is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586,

106 S. Ct. at 1356.  These facts must be more than a scintilla of evidence and must meet the standard

of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving

---

[2]In its order, the Court noted that, although the Plaintiff asserted these claims separately,
they constitute only one claim under Tennessee state law.

party is entitled to a verdict.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).  The "judge may not make credibility determinations or weigh the evidence."  Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## FACTS

The following facts set out by the Defendant are undisputed by Carroll.  In April 2002, the Plaintiff was employed as a supervisor of the anodize and extrusion work areas of Defendant's facility in Union City, Tennessee.  Approximately thirty-two employees reported directly to him. Hourly workers at the plant, called associates, are arranged in work areas where they assemble and prepare to assemble shower doors.  They have freedom to move about in the work area as needed to complete their job assignments.

Theresa Donnell began working as a full-time manufacturing associate at the facility on April 15, 2002.  At that time, she received a copy of the Kohler Associate Handbook (the "Handbook"), which included a policy prohibiting sexual harassment in the workplace.  She understood it was her responsibility to familiarize herself with the policies set forth in the Handbook.  Donnell worked on the second shift in a work area known as "finesse."  Carroll's work area was adjacent to the finesse area.

On or about January 2, 2003, another Kohler employee, George Rogers, transferred to the second shift from the first shift.  He was given the position of shift supervisor, a job assignment in which Carroll had expressed an interest.  Area supervisors directed and supervised the work of associates in their work area and reported to the shift supervisor.  Donnell's area supervisor was Frankie Fuller, who reported to Rogers.  The shift supervisor spent most of his time visiting the various work areas and observing the associates, including Donnell, performing their duties in order

to identify specific production-related needs.

Carroll and Donnell were friends, spoke to one another at work regularly and were, according to another associate, "flirtatious."  Rogers had advised the Plaintiff that he was spending too much time talking to Donnell in her work area.  Carroll had also been instructed, in response to various complaints, against "playing favorites" among the associates.  In the summer of 2003, Buddy Thompson, the Plaintiff's immediate supervisor, counseled him about socializing with Donnell in the work area.  On September 24, 2003, Chris Moore, manufacturing manager at the Union City facility, admonished Carroll regarding problems with his methods for communicating with associates.

In October 2003, according to Donnell, Rogers began staring at her, making sexual comments to others about her, brushing against her during meetings and making sexual comments. During that month, Donnell verbally complained to Jill Austin, Kohler's local human resources manager, that she was being observed for wasting time and was upset by it.  She related that Rogers had talked with her supervisor, Fuller, who confronted her about wasting time instead of working. At the time, a union organization campaign was taking place at the plant, which lowered productivity for some of the associates.  Donnell did not tell Austin that Rogers looked at her inappropriately.

Donnell was on approved medical leave from October 8 to December 15, 2003 and from January 7 to 24, 2004.  Workers at the plant often sought out Carroll if they had a problem, as he would do "anything to help anybody out there."  In late 2003, Donnell approached the Plaintiff about Rogers' harassment.  According to the Plaintiff, she told him that "she felt very uncomfortable with the way George was looking at her, making certain, you know, expressions toward her, standing too

close to her, and maybe trying to rub up against her, of stuff like that." Carroll advised that, if she felt uncomfortable or believed Rogers was doing something wrong, reporting it to her supervisor was the "proper channel."

At first, Carroll did not report or discuss with anyone what Donnell had told him. It was his understanding that an associate could go to any supervisor or other member of management to report inappropriate behavior. The Plaintiff believed that an employee should go to their own supervisor if they had a problem. According to Kohler's company policy, an associate may report sexual harassment to any supervisor or to human resources.

Donnell worked for 72 days between October 5, 2003 and May 17, 2004, the date she made her first written complaint against Rogers accusing him of sexually harassing her. Prior to May 17, 2004, Austin had no knowledge of the alleged harassment. Donnell advised that she would not work at Kohler unless Rogers was terminated. If he had been terminated at that time, it was likely Carroll would have taken his place as second shift supervisor.

On or about May 18, 2004, Austin initiated an investigation of Donnell's allegations. She interviewed several persons, including Donnell, Fuller and Rogers. In reviewing the complaint, she noticed that Donnell stated therein that she had previously reported the harassment to Carroll. Austin was concerned that this report was not forwarded to her. She interviewed the Plaintiff, who confirmed Donnell's statement that she had made the report to him. He explained that, even though he did not forward the charge to Austin, he knew he should have done so. According to Carroll, Austin informed him that, if Donnell sued Kohler, he would need to be a "witness for us." He responded by stating that he would tell the truth. It is undisputed that he was never asked by Austin to testify, falsely or otherwise, or sign a statement that was not true.

Based on his failure to inform her of the report, Austin recommended that Carroll be terminated.  She requested input from Thompson concerning Carroll's conduct as a supervisor and, after considering his comments, became convinced that termination was appropriate.  Austin prepared a proposed Authorized Corporate Transaction form requesting approval for the termination.  The form was first submitted to and approved by Thompson and then by Moore and Jonathan Kyle, the acting plant manager.  Pursuant to Austin's recommendation, it was decided by Kohler Company that Carroll's employment should be terminated based on his performance as a supervisor in failing to report Donnell's charges of sexual harassment by Rogers and in failing to exhibit proper supervisory skills in performing his duties.  Carroll was notified of the termination on June 29, 2004.  At that time, Moore advised him that "[w]e take care of our own."

<u>ANALYSIS OF THE PARTIES' CONTENTIONS</u>

<u>Failure to File EEOC Claim.</u>

The Defendant first argues that summary judgment as to the Plaintiff's claim under Title VII is appropriate based on his failure to file a discrimination charge with the Equal Employment Opportunity Commission (the "EEOC").  "In Title VII, Congress set up an elaborate administrative procedure, implemented through the EEOC, that is designed to assist in the investigation of claims of . . . discrimination in the workplace and to work towards the resolution of these claims through conciliation rather than litigation."  <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 180-81, 109 S. Ct. 2363, 2374-75, 105 L. Ed. 2d 132 (1989), <u>Granderson v. Univ. of Mich.</u>, No. 05-2453, 2006 WL 3627023, at *2 (6th Cir. Dec. 12, 2006); <u>Duncan v. Delta Consol. Indus., Inc.</u>, 371 F.3d 1020, 1024 (8th Cir. 2004), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Aug. 5, 2004).  An individual "seeking to bring a discrimination claim under Title VII in federal court must first exhaust [his] administrative

remedies." Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 731 (6th Cir. 2006), reh'g and

reh'g en banc denied (Nov. 13, 2006). Title VII requires that "[a] charge . . . be filed within one

hundred and eighty days after the alleged unlawful employment practice occurred . . ." 42 U.S.C.

§ 2000e-5(e)(1). A civil action must be filed within ninety days of the plaintiff's receipt of notice

of dismissal and right to sue from the EEOC. 42 U.S.C. § 2000e-5(f)(1). "It is well-established that

a party's exhaustion of administrative processes for filing a claim of discrimination is a condition

precedent to filing suit in the district court, rather than a jurisdictional prerequisite." Mitchell v.

Chapman, 343 F.3d 811, 819-20 (6th Cir. 2003), cert. denied, 542 U.S. 937, 124 S. Ct. 2908, 159

L. Ed. 2d 813 (2004). Because the requirement is jurisdictional, it is subject to equitable tolling.

Seay v. Tenn. Valley Auth., 339 F.3d 454, 469 (6th Cir. 2003).

Carroll acknowledges that he did not file an EEOC claim but argues that equitable tolling

should be applied in this case. The Court is to consider five factors in determining whether equitable

tolling should be permitted:  "1) lack of notice of the filing requirement; 2) lack of constructive

knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice

to the defendant; and 5) the plaintiff's reasonableness in remaining ignorant of the particular legal

requirement." Id. (quoting Truitt v. County of Wayne, 148 F.3d 644, 648 (6th Cir. 1998)). The third

factor requires a demonstration by the Plaintiff of his diligence in pursuing his claim. Id. These

factors are not exclusive, however, and decisions concerning equitable tolling should be made on

a case-by-case basis. Id. Courts are admonished that the doctrine "is restricted and to be carefully

applied." Id.

In response, the Plaintiff offers his affidavit in which he states that, when he attempted,

without being represented by counsel, to submit his EEOC charge within the prescribed period, a

representative of the agency informed him that "they only investigate complaints that concern gender, age, or race and that [his] application did not fall within these categories." On that basis, his application was refused. (Aff. of Jerry Carroll ("Carroll Aff.") at ¶¶ 2-3, 5) He relied on the statement of the EEOC representative that his charge was not subject to the agency's review. (Carroll Aff. at ¶ 4) The Court finds that the Plaintiff has demonstrated that he was diligent in pursuing his rights and that he was prevented from continuing his pursuit thereof by the statements of the EEOC representative. Therefore, at the very least, he has raised a question of fact concerning exhaustion of his administrative remedies and the application of the doctrine of equitable tolling. Accordingly, the Defendant's motion for summary judgment will not be granted on that basis.

Retaliation Claim under the THRA.

Kohler next avers that Carroll has failed to establish a claim of retaliation under the THRA, which provides that it is a violation of the state statute to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory . . . or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing . . ." Tenn. Code Ann. § 4-21-301(1). Claims of retaliation brought pursuant to the THRA are analyzed in the same way as those instituted under Title VII. Miller v. City of Murphreesboro, 122 S.W.3d 766, 776 (Tenn. Ct. App. 2003), app. denied (Dec. 22, 2003).

> To establish a prima facie case of retaliation, a plaintiff must show: (1) that [he] engaged in protected activity; (2) that defendant knew of this exercise of [his] protected rights; (3) that defendant consequently took an employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity and adverse employment action. If a plaintiff establishes a prima facie case of retaliation, the defendant may rebut the presumption of retaliation by asserting a legitimate non-discriminatory reason for its actions. The plaintiff must then show by a preponderance of the evidence that the employer's proffered reason for the

8

employment action is pretextual.  The plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant['s] explanation and infer that the defendant[] intentionally discriminated against [him].  The plaintiff must submit evidence demonstrating that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action.

Balmer v. HCA, Inc., 423 F.3d 606, 613-14 (6th Cir. 2005) (internal citations and quotation marks omitted).

It is the position of the Defendant that Carroll has failed to identify the "protected activity" in which he engaged that resulted in his discharge.  "Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation" of the statute.  Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579 (6th Cir.), cert. denied, 531 U.S. 1052, 121 S. Ct. 657, 148 L. Ed. 2d 560 (2000).  As was noted by the court in Johnson, the EEOC "has identified a number of examples of 'opposing' conduct which is protected by Title VII, including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer -- e.g., former employers, union, and co-workers."  Id. at 579 (citing EEOC Compliance Manual, (CCH) ¶ 8006).

Carroll maintains that he engaged in protected activity when he opposed the sexual harassment of Donnell by directing her to the proper channels for complaints about sexual harassment and by refusing to testify for or otherwise aid Kohler in efforts to conceal the harassment.  With respect to the latter, the Plaintiff submits that, following his interview with Austin, many of the other supervisors stopped talking or socializing with him.  He also points out that, during the meeting in which he was advised of his termination, he was informed that he should have put a stop to Rogers' harassment.  Carroll said, "You mean to tell me that you can -- you're

9

actually going to fire me, or terminate me, because of a -- somebody filed a lawsuit against George Rogers? You're telling me that he's going to stay and you're going to fire me?" Moore then made the statement that "[w]e take care of our own." The Plaintiff argues that Kohler fired him because he "refused to comply with the Defendant's policy of taking care of its own." (Pl.'s Mem. of Law in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. on All Counts in the Compl. at 6)

The Plaintiff's contentions are unavailing. First, even though he identifies his opposition to Rogers' behavior as "protected activity," Carroll does not allege he was fired for opposing sexual harassment. Thus, the Plaintiff has failed to establish the necessary causal connection between the protected activity and the adverse employment action. See Balmer, 423 F.3d at 613-14 (setting out elements of retaliation claim). Carroll's assertion that his refusal to aid Kohler in concealing Rogers' behavior fares no better. In his deposition, the Plaintiff offers the following testimony concerning his interview with Austin and the possibility that he would have to testify:

> A:   And she said, "Well, you know that Ms. Donnell may file a lawsuit against the company, a sexual harassment suit against the company."
>
> And I said, "Well, I don't know anything about that."
>
> And she said, "You know, if she does, you'll have to be a witness for us."
>
> And I told -- I told her, I said, "Well, you know, I may have to be a witness, but I'll have to tell the truth. I just can't be a witness for the company; I'll have to just be honest and tell what I know."
>
> Q:   We've been through this already in a deposition in your other case. She never asked you to lie or testify falsely, did she?
>
> A:   She just asked me to testify for them.
>
> Q:   Well, no, I'm asking you a question. She didn't ask you to testify falsely, did she?
>
> A:   No.

Q:      Okay.  She didn't ask you to lie.  Right?

A:      No, she didn't come out and say that.  No, sir.

Q:      She didn't ask you to lie, did she?

A:      I believe I just answered that.

Q:      I thought you were shaking your head.  She didn't ask you to lie.  Correct?

A:      I said no, sir.

Q:      Okay.

A:      She just asked me to testify for the company.

Q:      For the company.  Okay.  So what she meant --

A:      She said, "You may have to be a witness for us."

Q:      Okay.  And you took "for us" to mean that you had to take sides.  Right?

A:      Correct.

Q:      Okay.

A:      So I answered her by saying that I would just tell the truth.

Q:      Okay.

A:      To what happened -- to what I knew.

Q:      Right.  And that was okay with her, wasn't it?

A:      I can't answer that.

Q:      Okay.  All right.  Mr. Carroll, in a lawsuit, do you think that -- How do you understand and what do you mean by a witness for a -- the company?  What do you -- what do you understand that to mean?

A:      A witness for the company.

Q:      Yeah.  You said Ms. Austin said you'd be called as a witness to testify for the company.

11

A:      No, she said "for us."

Q:      Okay.  Who was "us"?

A:      I didn't ask her who "us" was.

Q:      Okay.  Who did you understand "us" to be?

A:      As me -- her wanting me to testify on their behalf, instead of me telling -- telling the truth, because -- exactly what happened.

Q:      Okay.  So you understood -- It was your interpretation that testifying "for us" was that a witness has to testify for one party or against one party.  Is that your understanding?

A:      That's the way I took it.

Q:      Okay.  That's the way you understood it.

A:      She didn't ask me just, you know, "You may have to be a witness."

Q:      Uh-huh.

A:      She said, "You may have to testify for us."

Q:      Okay.  Okay.

A:      And I said, "I may have to go to court to be a witness, or to testify, but I'm going to tell the truth."

Q:      Okay.  And she said words to the effect of, "Okay, fine."  Correct?

A:      I don't recall if she said, "Okay, fine," or not, but --

Q:      She indicated that that was okay, didn't she?

A:      I don't know if she -- I don't recall her saying anything.  I mean --

Q:      Okay.  You just don't recall, one way or the other, at this point in time.

A:      Correct.

Q:      Did she ask you to sign any statements or anything that was false or untrue?

A:      No, sir.

Q:      Okay.  Did she ever tell you, "Unless you testify the way I want you to, you'll be terminated?"

A:      No, sir.

Q:      Did she ever tell you that unless you testify favorably for the company, you'd be terminated?

A:      No, sir.

(Dep. of Mr. Jerry Carroll ("Carroll Dep.") at 33-36)

Viewing the evidence in the light most favorable to the Plaintiff, the Court finds that his statement that he would tell the truth does not amount to a refusal to assist his employer in concealing wrongful conduct because he was never asked, directly or indirectly, to make a false statement.  Therefore, there was no protected activity.

As to Moore's comment about the company taking care of its own, it is unclear to the Court what the significance of the statement actually was.  Both Rogers and Carroll were long-time employees of Kohler.  In fact, on the date of his termination, the Plaintiff was two months from his 32-year anniversary with the company.  Therefore, it is difficult to imagine that Carroll was any less "our own" from the employer's standpoint than Rogers.  The Plaintiff's deposition testimony in connection with his termination sheds little light on the question:

A:      . . . So I got up and walked in there to Chris Moore's office, and [Jill Austin] said, "Come on in here."  Well, I walked in there and there was Buddy Thompson, Chris Moore, and Jill and -- I don't know, some other gentleman was there.  They never did -- I didn't know him, and they didn't introduce him.

And I sat down at the table, and I said, "What's going on?" . . . [Moore] said, "As of today, your employment with Kohler is terminated."

Q:      Chris Moore said that.

13

A:     Yes, sir.

Q:     Okay.

A:     And I said, "On what grounds?"  And he said, "Job performance."  And I looked back at him, and I said, "You know that'll never fly."  I said, "Because," I said, "my shift, second shift extrusion anodize, runs more than first and third shift."  I said, "You can ask Buddy."  I said, "He's standing right behind me."  And Buddy wouldn't do nothing.  And I said, "Or you can pull the records."  I said, "whichever one you want to do."  I said, "But that'll never fly."  And then Jill Austin said, "I need your credit card."

Q:     You had a company credit card?

A:     Yes, sir.

Q:     Okay.

A:     And so I got up and gave it to her.  And I said -- I said, "You know that I've done my job thirty-two years here, and," I said, "I don't see how you can just come up and say that all the sudden my job performance is going to cost me my job, when you know that that's not true."

       And he said, "Well," he said, "regardless," he said, "you know that sexual harassment."

Q:     Who said this?  I'm sorry.

A:     Chris Moore did.

Q:     Chris Moore.  Okay.

A:     He said -- He's the one that done the talking.  He said, "You know that sexual harassment suit that Theresa Donnell's got against Kohler Company?" I said, I guess so.  What -- What's that got to do with me?"  I said, "You know I'm not even involved in it."

       He said, "Well, you should have put a stop to it."

       I said, "How am I supposed to put a stop to a superintendent or supervisor, who's my boss?"  I said, "I told her to go to her supervisor, like company policy says."  I said, "Then she went to Jill Austin."  I said, "Then I had a meeting with Jill Austin."  I said, "Then I had a -- I also had a meeting with Buddy and talked to him about it."  I said, "I've even talked to George about

14

it."

And I said, "You mean to tell me that you can -- you're actually going to fire me, or terminate me, because of a -- somebody filed a lawsuit against George Rogers?"  I said, "You're telling me that he's going to get to stay and you're going to fire me?"

And that's when he looked at me and he said, "We take care of our own," and nodded his head for Buddy to walk me out the door.

Q:      Chris Moore said that?

A:      Correct.

Q:      Okay.  Anything else you recall Chris Moore saying?

A:      That's pretty much the way it went. . . .

(Carroll Dep. at 44-47)  The parties did not submit any testimony by Moore himself.  "While remarks by a decisionmaker reflecting bias against the plaintiff [in a discrimination case] [is] relevant . . ., isolated and ambiguous comments are too abstract in addition to being irrelevant and prejudicial, to support a finding of discrimination."  Norbuta v. Loctite Corp., 1 F.App'x 305, 316 (6th Cir. 2001) (internal citation and quotation marks omitted).  Upon review of the deposition testimony and the parties' briefs, the Court finds Moore's comment too vague and ambiguous to form the basis of a retaliation claim.

Based upon the Plaintiff's failure to establish the elements of the prima facie case, the Defendant's motion for summary judgment on his claim of retaliation under the THRA is GRANTED.[3]

---

[3]Although the THRA and Title VII are nearly identical in substance and are analyzed in the same manner, the two statutes differ in some respects, including the applicable statute of limitations.  See El-Zabet v. Nissan N. Am., Inc., No. 05-6729, 2006 WL 3779814, at *2 (6th Cir. Dec. 22, 2006).  Nevertheless, based on the Court's ruling that equitable tolling may be applied to Carroll's Title VII claim and as the Defendant failed to put forth any other argument supporting dismissal of the federal retaliation claim, the Court is unable at this point to dismiss

Tennessee Public Protection Act.

The TPPA, the Tennessee whistle blower statute, provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(a).  In order to prevail on a TPPA retaliation claim, the plaintiff must demonstrate (1) his "status as an employee of the defendant"; (2) his "refusal to participate in, or to remain silent about, illegal activities"; (3) "[t]he employer's discharge of the employee"; and (4) "[a]n exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee." Brooks v. Invista, No. 1:05-CV-328, 2007 WL 470401, at *8 (E.D. Tenn. Feb. 7, 2007).  "Once a plaintiff has established a prima facie case, the burden shifts to the employer to advance a non-discriminatory reason for the termination.  The burden then shifts back to the plaintiff to show that [his] termination was solely for the reasons which [he] initially alleged.  Courts have recognized that the plaintiff has indeed a formidable burden in establishing elements two and four of the cause of action." Id. (internal citations and quotation marks omitted).

Kohler submits that Carroll cannot show anyone at its facility asked him to participate or remain silent about illegal activities.  "Illegal activities" are defined in the statute as "activities that are in violation of the criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304©.  A plaintiff may satisfy the "illegal activities" prong by showing he had a "reasonable cause to believe a law, regulation, or rule has been violated or will be violated." Franklin v. Swift Transp. Co., Inc., 210 S.W.3d 521, 529 (Tenn. Ct. App. 2006), app. denied (Nov. 20, 2006) (citing Mason v. Seaton, 942

---

it.  Therefore, the Plaintiff's claim under Title VII remains.

S.W.2d 470, 472 (Tenn. 1997)). The statute "does not require proof the employer instructed the employee to remain silent about an illegal activity. Rather, a plaintiff need only show he refused to remain silent about an illegal activity -- that is, he spoke out about an illegal activity." <u>Sacks v. Jones Printing Co., Inc.,</u> No. 1:05-CV-131, 2006 WL 686874, at *4 (E.D. Tenn. Mar. 16, 2006) (internal citation omitted). It is important to note that the "violation by the employer must implicate important public policy concerns . . ." <u>Franklin</u>, 210 S.W.3d at 530. The claim of "retaliatory discharge is applicable only in limited circumstances, where certain well-defined, unambiguous principles of public policy confer upon employees implicit rights which must not be circumscribed or chilled by the potential of termination." <u>Id.</u> at 530-31 (quoting <u>Stein v. Davidson Hotel</u>, 945 S.W.2d 714, 717 (Tenn. 1997)).

Carroll insists he had reasonable cause to believe Rogers was sexually harassing Donnell in violation of state and federal law. He posits that a reasonable jury could conclude that Kohler requested he testify in its favor regarding the harassment, that he refused to alter his testimony and remain silent about Rogers' behavior and that he was fired as a result. For the reasons articulated in detail in the previous section of this opinion, however, the Plaintiff has failed to establish the existence of an issue of fact concerning whether he refused to participate in illegal activity, that is, falsely testify on behalf of his employer. Nor is there any evidence whatsoever to suggest that his employment was terminated because he refused to remain silent about the harassment. Indeed, he was fired *because he unilaterally chose to keep silent* about the harassment, even though he knew he should have forwarded Donnell's concerns to the human resources manager. As he cannot establish the second element of the TPPA claim, it must fail.

<u>Common Law Retaliatory Discharge.</u>

A claim of common law retaliatory discharge is the second method by which a whistle blower in Tennessee may recover from his employer.  See <u>Sacks</u>, 2006 WL 686874, at *3.  The claim "must evidence a violation of a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision." <u>Franklin</u>, 210 S.W.3d at 530.  In order to prevail, the plaintiff must show "(1) that an employment-at-will relationship existed; (2) that he was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy." <u>Id.</u> at 528.  Kohler's motion focuses on the Plaintiff's failure to identify a "clear public policy" with respect to the third element of the claim.

Carroll again maintains that, based on Austin's comment about being a witness "for us" and Moore's reference to "taking care of their own," a jury could reasonably determine that he refused to remain silent about harassment or aid Kohler in protecting the harasser, thereby violating the clear public policy of prohibiting sexual harassment in the workplace.  As the Court has previously noted herein, however, the Plaintiff was never asked by his employer to protect Rogers and was instead fired for remaining silent about the harassment, rather than refusing to do so, by failing to pass on Donnell's complaint to Austin.  Accordingly, summary judgment is GRANTED as to the common law retaliatory discharge claim.  Based on the Court's decision, it need not address the Defendant's argument that the facts do not support an award of punitive damages for this common law claim. <u>Intentional/Negligent Breach of Loyalty.</u>

It is the Defendant's position in advancing this claim that Carroll breached a duty of loyalty

to Kohler in failing to report Donnell's allegations.  An employee has a fiduciary duty of loyalty to his employer.  "An employee must act solely for the benefit of the employer in matters within the scope of his employment.  The employee must not engage in conduct that is adverse to the employer's interests."  Efird v. Clinic of Plastic & Reconstructive Surgery, P.A., 147 S.W.3d 208, 219 (Tenn. Ct. App. 2003), app. denied (Aug. 30, 2004) (quoting Knott's Wholesale Foods, Inc. v. Azbell, No. 01A-01-9510-CH-00459, 1996 WL 697943, at *3 (Tenn. Ct. App. Dec. 6, 1996)) (internal quotation marks omitted).  In Booth v. Fred's, Inc., No. W2002-01414-COA-R3-CV, 2003 WL 21998410, at *13 (Tenn. Ct. App. Aug. 19, 2003), the Tennessee Court of Appeals noted that

> [w]e equate breaches of [the] duty of loyalty with the acts of a traitor.  Traditional examples of breaches of loyalty duties in the employment context include acts of an employee in direct competition with the financial, proprietary, or business interests of the employer, thereby placing the personal interests of the employee before those of the employer, the sale or distribution of the employer's protected trade secrets, and a myriad of other destructive acts amounting to more than mere mistaken judgment or negligence.  Breaches of loyalty are most often intentional, destructive acts completed explicitly for the employee's own self-interests, in direct violation or competition with the interests of an employer.

In the Court's view, Carroll's failure to report the complaint in accordance with company policy falls far short of the types of conduct necessary to constitute a breach of loyalty under Booth.  Rather, the conduct present in this case appears much more at home in the category of "mere mistaken judgment or negligence."  See Booth, 2003 WL 21998410, at *13.  Indeed, the court of appeals went on to observe that "we find no case law to support defendant's base assertion that violation of established company policy necessarily constitutes a breach of duty of loyalty."  Id. at *16.  Consequently, the motion of the Defendant for summary judgment as to Counts I and II of the counterclaim is DENIED.

## CONCLUSION

19

For the reasons set forth herein, the motion for summary judgment of the Defendant as to all counts in the complaint is GRANTED IN PART AND DENIED IN PART.  Specifically, the motion is denied as to the Title VII claim and granted as to the remainder.  In addition, the Defendant's motion for summary judgment on counts I and II of the counterclaim is DENIED.

IT IS SO ORDERED this 19th day of March, 2007.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE